STATE OF CONNECTICUT *v.* JULIO MORQUECHO
(AC 33830)

Beach, Bear and Espinosa, Js.

Argued April 26—officially released October 30, 2012

*Mary Beattie Schairer*, special public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Julio Morquecho, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] The defendant claims that the court improperly (1) admitted expert testimony related to domestic violence and (2) admitted a witness' prior testimony after determining that the witness was unavailable. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts in support of its verdict. The defendant, the victim, Maria Chulca, and their two children originally lived in

---

[1] The court imposed a sentence of fifty-five years incarceration.

Ecuador before moving to Danbury. The defendant and the victim never were married. Once living in Danbury, the victim worked at two different restaurants. In January, 2005, the victim's two brothers, Jose Chulca and Luis Chulca, moved to Danbury from Ecuador, and, in February, 2005, they moved into an apartment with the defendant, the victim and the two children.

In the spring of 2005, the victim became involved romantically with a coworker, Abel Quinde. Upon learning of this, the defendant became angry and stated that he wanted to kill Quinde. The victim was afraid of the defendant and sought advice from staff at a women's center in Danbury. Specifically, the victim received advice about how safely to move out of the apartment she shared with the defendant and how to care for her children during such a transition. In May, 2005, the victim moved out of her apartment with the help of law enforcement officers and without notifying her family of her whereabouts. She was admitted to a domestic violence crisis center in Norwalk on May 19, 2005.

When the defendant learned that the victim left their residence, he stated that if the victim and Quinde were together, he would kill Quinde. The defendant, relying on military training, stated to the victim's brothers that the most efficient way to kill someone was to slit the person's throat from behind, so that the person did not have time to react. As he said this, he made hand movements to demonstrate how he could kill someone in this manner.

On June 20, 2005, the victim applied for a restraining order against the defendant, alleging an immediate threat to her physical well-being. Four days later, the victim and Quinde were present at a scheduled appointment at the women's center. The defendant confronted them inside the women's center, upsetting the victim.

Staff members of the women's center escorted the victim to a secured area and called the police. When the police officers arrived, the defendant lied to the police concerning his presence and was arrested for violating a restraining order. In a hearing that followed, the defendant pleaded guilty to violating a restraining order. The court sentenced the defendant to 364 days incarceration, execution suspended, and two years of probation.

Sometime in July, 2005, the defendant, having learned of the victim's whereabouts, drove to a violence crisis center in Norwalk, where he approached the victim. The defendant asked the victim to reunite with him. The defendant's presence upset the victim, and she refused to reunite with the defendant.

The victim left the crisis center in July, 2005, and lived in Danbury, but she was compelled to relocate again because the defendant learned where she was living. In September, 2005, the victim moved into a new apartment in Danbury with her children and her brothers. The defendant learned where she was living, and he attempted to visit her at the apartment several times when her brothers were at work. In the fall of 2005, the defendant told an acquaintance of the victim that if the victim did not forgive him and return to him, she might not be with anybody else.

On September 12, 2005, the defendant and Quinde had a physical altercation on a public street in Danbury. When the police arrived, the victim was visibly upset, crying and shaking. During the altercation, Quinde appeared to be protecting the victim. Police officers arrested the defendant, who behaved in a highly agitated manner even after their arrival. The defendant pleaded guilty to violation of a restraining order and admitted to having violated his probation. For the finding of violation of probation, the court sentenced the defendant to a ninety day period of incarceration. For

the conviction of violation of a restraining order, the court imposed a 364 day suspended sentence, followed by three years of probation, with the special condition that the defendant was to have no contact with the victim.

The defendant was released from prison on April 13, 2006. Shortly thereafter, the defendant went to the victim's apartment. He spoke to the victim's brothers, stating that he wanted to reunite with the victim but, if she was with someone else, "it would be better just to kill [her]." The defendant had a history of harassing the victim on her commute to work, on her commute home from work and at her workplace. This conduct upset the victim. On April 18, 2006, the defendant visited the victim at her workplace. He told the victim that, if she did not stop seeing Quinde, he would kill her or Quinde, or take away her children. Although the defendant's angry words upset the victim, there was no evidence that she called the police.

On April 19, 2006, the victim was scheduled to work at 5 p.m. Sometime after 6 p.m., the defendant asked an acquaintance of the victim whether she had seen the victim. The acquaintance had seen the victim, but she lied and said she had not because the defendant appeared to be angry. At the time, the defendant was carrying something, shaped like a ruler that was about twelve inches long, in a plastic bag under his arm. The acquaintance observed the defendant again later that evening around 11 p.m., not far from the victim's apartment.

The victim left work at 1 a.m. on April 20, 2006, and drove one of her coworkers home. The coworker noticed that the victim appeared to be upset and asked her what was wrong. The victim stated that she was fearful of the defendant. She explained that sometimes the defendant would wait for her outside her apartment

when she returned from work and that, on one such occasion, he grabbed her. The victim dropped off her coworker at the coworker's Danbury residence at 1:40 a.m., before proceeding home.

Shortly after 6 a.m., Danbury police responded to a 911 call concerning the victim. When emergency personnel arrived on the scene, they discovered the victim dead on the ground in front of her apartment building. She exhibited two major wounds to her neck, wounds that were consistent with the use of a sharp instrument, as well as several other cuts and abrasions. Also, the victim exhibited defensive type wounds on her hands.

The police interviewed the defendant, who denied any involvement in the victim's death. This appeal followed the defendant's conviction for murder of the victim. Additional facts will be set forth as necessary.

I

First, the defendant claims that the court improperly admitted expert testimony concerning domestic violence. We disagree.

At trial, the state presented testimony from Evan Stark, who holds a master's degree in social work and is an expert in the field of domestic violence. Stark testified concerning his credentials and experience in the field of domestic violence. He defined the term "domestic violence"[2] and discussed different types of domestic violence. Additionally, Stark testified with regard to the traits exhibited by victims of domestic violence generally, such as their gender, reporting habits and behavior. Stark testified about characteristics

---

[2] Stark testified: "I would define domestic violence as any situation where a partner or a former partner of somebody who's involved in a relationship uses forms of coercion, not limited to, but typically including, violence and threats, to hurt or to frighten or to subjugate, in some cases, or to make dependent, the victim in that instance."

common to relationships characterized by domestic violence, such as jealousy, stalking, threats and fear. At the conclusion of his testimony, Stark testified that he "[knew] nothing about this case, except . . . the very basics." Stark did not testify with regard to any specific facts of the present case and did not opine that the victim was a victim of domestic abuse.

The court permitted Stark's testimony over the defendant's objection. On appeal, the defendant raises a multifaceted challenge to the court's admission of the testimony. Before turning to the specific arguments of the defendant, we set forth our standard of review. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 670–71, 31 A.3d 1012 (2011).

## A

First, the defendant argues that the court should have excluded Stark's testimony on the ground that, in light of the factual findings to be made by the jury, "[t]he jury did not need the assistance of an expert to make its decision."[3] Stated otherwise, the defendant argues that Stark's testimony was unlikely to have assisted the jury because the jury could have resolved the issues

---

[3] At trial, the defendant, arguing that the court should preclude Stark's testimony, raised a materially similar argument. Specifically, the defendant's attorney argued that, because the evidence presented at trial did not reflect that the victim was physically abused by the defendant, Stark's testimony concerning domestic violence was not "relevant" or "probative" to any issue in the present case.

before it by applying its common knowledge and every-day experience in the affairs of life.

"A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Conn. Code Evid. § 7-2.

Stark provided testimony about domestic violence and the general behavioral traits of persons in a relationship characterized by domestic violence. There is no dispute that Stark was qualified as an expert and that his testimony was based on specialized knowledge. The defendant characterizes his claim as whether Stark's testimony was "necessary" to resolve an ultimate issue of fact, yet our standard for the admission of expert testimony permits the admission of such testimony when such testimony "will assist the trier of fact in understanding the evidence . . . ." Conn. Code Evid. § 7-2. There was ample evidence in this case that the defendant, by the use of violent and threatening conduct, attempted to control the victim.[4] There was evidence that the victim and the defendant were in a relationship characterized by domestic violence. The

---

[4] There was evidence that the defendant slapped the victim twice, that on one occasion the defendant waited near the victim's driveway for her to return home and grabbed the victim by the arm when he encountered her and that the victim had obtained a protective order after alleging "an immediate and present physical danger to [her] and/or [her] minor children" posed by the defendant. A coworker of the victim described an incident in which the defendant followed the victim and her in his automobile as they drove home from work. During the incident, the defendant repeatedly turned the headlamps of his automobile on and off and nearly caused an automobile accident. Apart from the defendant's threats against the victim's well-being, he behaved violently in the victim's presence by engaging in a physical altercation with Quinde in public. There was evidence that the defendant, on several occasions, threatened the victim, harassed the victim and greatly upset the victim.

defendant has failed to demonstrate that Stark's testimony would not assist the trier of fact in understanding the evidence, specifically, the nature of the victim's behavior in relation to the defendant, which, certainly, was relevant to evaluating whether the defendant caused her death.

Specifically, we note the evidence that the victim exhibited defensive wounds and that her assault likely began in a dark secluded area near her residence after 1:40 a.m. The evidence did not suggest that the victim initially was assaulted near her automobile or near the entry to her residence. There was no evidence that the victim called for help or used her cellular telephone to summon assistance. On these facts, it could be inferred that the victim interacted, albeit briefly, with her assailant. Insofar as the state attempted to prove beyond a reasonable doubt that the defendant was the assailant, it was advantageous to the state's case for the state to demonstrate that the victim afforded *the defendant* an opportunity to commit the crime at that time and place. To this end, it was helpful for the jury to understand why the victim might have interacted with the defendant at all, rather than immediately taking flight from him.

Stark testified that, generally, domestic violence relationships do not end neatly but persist in some form despite the physical separation of the parties. Stark testified that, despite taking steps to end abusive relationships, victims of domestic violence typically continue to interact with their abusers for a variety of reasons, such as reducing the level of violence in the ongoing relationship or merely achieving immediate protection. Insofar as this observation conveyed "scientific, technical or other specialized knowledge"; Conn. Code Evid. § 7-2; we conclude that the court did not abuse its discretion in concluding that it would be helpful to the jury in its assessment of the evidence. There was ample evidence that the victim feared the defendant

and that she attempted to end her contact with the defendant. She sought counseling, moved out of the residence that she shared with the defendant and obtained a protective order. To the extent that this evidence might have appeared to contradict a finding that the victim interacted with the defendant, even briefly, at the time of the murder, Stark's testimony concerning the conduct of victims of domestic violence was useful to the jury in its appraisal of the victim's conduct and whether, as the state argued, the defendant was the perpetrator of the victim's murder. Thus, we conclude that the court's admission of the testimony was not an abuse of discretion.

## B

Next, as he did at trial, the defendant argues that Stark's testimony was inadmissible because it concerned battered woman's syndrome and, thus, was irrelevant. As the defendant correctly points out, the state conceded at trial that the victim was not a battered woman in that it did not rely on evidence that, prior to the events at issue, the defendant physically assaulted the victim such that she could be considered a battered woman.

Our review of Stark's testimony leads us to conclude that his testimony did not pertain to battered woman's syndrome, but to the broader topic of the behavior of persons in a relationship characterized by domestic violence. Stark's testimony was in no way limited to relationships marked by physical abuse, but those marked by violent and threatening conduct aimed at coercing a victim to behave in a certain way. Because this aspect of the claim is not based on the evidence presented at trial, it is without merit.

## C

Next, the defendant claims that Stark's testimony was inadmissible on relevance grounds "[b]ecause the

relationship at issue did not fall within the parameters of Stark's definition of domestic violence . . . ." As set forth earlier in this opinion, Stark defined domestic violence as a situation in which one person uses forms of coercion, typically including violence and threats, to hurt, to frighten or to subjugate a victim. Stark testified that there are at least two patterns of domestic violence. One involves physical violence accompanied by psychological abuse. The other involves "a much more complex pattern . . . called coercive control." Stark stated: "[W]hat's going on in that situation is, in addition to violence and forms of emotional abuse, usually, patterns designed to isolate a victim, degrade or shame them sexually, intimidate them, frighten them . . . and, perhaps, most importantly, to control them . . . ."

Our review of the record reflects that, at trial, the defendant argued that Stark's testimony was inadmissible because there was no evidence that the victim was a battered woman or that the defendant had engaged in physical violence against the victim. The defendant did not argue that Stark's testimony was irrelevant because the evidence did not fit into either of the types of domestic violence described by Stark; the defendant's relevancy objection preceded this testimony. Because this aspect of the defendant's evidentiary claim was not distinctly raised at trial, we do not reach its merits.[5] See, e.g., *State* v. *Alvarez*, 216 Conn. 301, 306, 579 A.2d 515 (1990) ("[o]nce counsel states the authority and ground of his objection, any appeal will be limited to the ground asserted" [internal quotation marks omitted]).

[5] "[A]s a precautionary measure," the defendant urges us to review any unpreserved aspects of his claim under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); under the plain error doctrine codified in Practice Book § 60-5 or by the exercise of this court's inherent supervisory authority over the administration of justice. The defendant, however, has not provided this court with a sufficient analysis of his claims under any of these doctrines. Nonetheless, even were we to determine that the defendant's blanket invocation of these doctrines relating to extraor-

## D

Next, the defendant argues that Stark's testimony concerning nonphysical " 'coercive control' " in relationships characterized by domestic violence "was irrelevant because Stark had not reviewed the evidence regarding [the] defendant's specific domestic situation prior to trial and had never made a diagnosis [concerning his relationship with the victim]." Relying on *State* v. *Carpenter*, 275 Conn. 785, 794–813, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006), the defendant asserts that Stark's testimony, insofar as it pertained to codependency in a relationship characterized by domestic violence, was irrelevant absent a psychological evaluation of the defendant and the victim, followed by a diagnosis that the parties were in a codependent relationship.

The record reflects that, at trial, the defendant objected on relevancy grounds to the admission of Stark's testimony. The record, however, does not reflect that the defendant raised an objection that was grounded, even tangentially, in terms related to the present argument. Accordingly, we decline to review this aspect of the defendant's claim. See, e.g., *State* v. *Alvarez*, supra, 216 Conn. 306.

## E

Next, the defendant argues that the court should have excluded Stark's testimony because "it improperly implicated [him] in the crime." The defendant takes issue with four questions asked of Stark during the state's direct examination. Specifically, the prosecutor, following Stark's testimony about domestic violence relationships in general, asked Stark to opine about whether women are safer when they leave domestic

---

dinary review was sufficient, we readily would conclude that none of them apply to the present evidentiary claim.

violence relationships, what role jealousy plays in domestic violence relationships, what significance stalking plays in domestic violence relationships and what significance threats to harm others plays in domestic violence relationships. On appeal, the defendant argues that these questions "[were] designed to explicitly elicit answers implicating [the] defendant in the crime. . . . [Their] goal was to convince the jury that [the] defendant was responsible for the crime based upon a sociologist's testimony that other people's behavior led to homicide." The defendant argues that the questions, while "triggered by evidence the jury had heard," elicited inadmissible propensity evidence.

The record does not reveal that, at trial, the defendant objected to these inquiries during the state's examination of Stark or that the defendant raised an objection of this nature. For this reason, we decline to review this aspect of the defendant's evidentiary claim. See, e.g., *State* v. *Alvarez*, supra, 216 Conn. 306.

F

Next, as he did at trial, the defendant argues that the court should have excluded Stark's testimony on the ground that it was not merely adverse to the defense but unfairly prejudicial. Essentially, the defendant argues that the evidence lacked any probative value and that it was highly prejudicial in that it "unfairly created sympathy for [the victim], and anger toward [the] defendant." We disagree.

"Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion

is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 582, 10 A.3d 1005, cert. denied, U.S. , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

The defendant's analysis inaccurately presumes that Stark's testimony lacked any connection to the evidence in this case. Because it was reasonable to find that the defendant's violent and threatening conduct caused the victim to fear him, to alter her living arrangements and to obtain a protective order against him, we conclude that Stark's testimony was likely to assist the jury in evaluating the nature of the defendant's relationship with the victim. Furthermore, the defendant argues that "[b]ecause [Stark's] conclusory testimony led the jurors to believe that it was the natural result that murders occur when certain factors are present, it gave the jury no choice but to conclude that [the] defendant had also murdered." The flaw in this argument, however, is that Stark did not testify that murder is the natural or customary result of a relationship characterized by domestic violence. Moreover, the defendant argues that Stark's testimony likely misled the jury into believing that its deliberations were easy, made its job seem "cut and dry" when, in fact, Stark knew almost nothing about the facts of this case. Insofar as Stark provided information about domestic violence relationships in general and testified clearly that his testimony was not based on his knowledge of the parties or the facts of this case, we disagree with this assessment of the testimony.

We disagree that the prejudicial effect of the evidence outweighed its probative value. Affording the court's determination every reasonable presumption of correctness, we conclude that the court's ruling was not an abuse of its discretion.

## II

Next, the defendant claims that the court improperly permitted the state to present the prior testimony of Quinde on the ground that he was unavailable. We disagree.

The following additional facts underlie this claim. Prior to the presentation of evidence, the defendant's attorney alerted the court to the fact that, at a prior criminal trial of the defendant that took place approximately five months earlier,[6] the state presented the prior testimony, elicited during a probable cause hearing, of certain unavailable witnesses. The defendant's attorney stated that although, at the prior trial, the court determined that the witnesses' prior testimony was admissible on the ground that the witnesses were unavailable, the defense argued it was not proper to treat the issue as settled for purposes of the defendant's present trial. The prosecutor addressed the issue, noting that the witnesses at issue were living outside of the United States and that, despite the state's efforts, they declined to return to Connecticut for the prior trial. The prosecutor stated that the court, at the prior trial, determined that the witnesses were unavailable and that, by means of their cross-examination by the defendant at the probable cause hearing, there was no violation of the defendant's right to confront the witnesses. The prosecutor stated that he intended to demonstrate that the witnesses still were unavailable for the present trial. Quinde was one of these unavailable witnesses.

During the present trial, in November, 2009, the state presented the testimony of Marylou Comstock, an investigator in the office of the state's attorney. Comstock testified that one of her duties in assisting in the

---

[6] At the prior trial, which was based on the events at issue in this case, the defendant was convicted of stalking in the first degree. The jury in that trial, however, was unable to reach a verdict as to the murder count.

preparation of cases for trial is to search for witnesses. Comstock testified that in January, 2009, as part of her work in this case, she was asked to locate Quinde. She testified that Quinde was living in Ecuador. Comstock testified that she searched for Quinde with the use of various databases and contacts. She testified that, in September, 2009, she searched once again for Quinde and that her research encompassed hospital data, motor vehicle data, tax data, department of correction data and department of labor data.

Additionally, the state presented testimony from Daniel Trompetta, a detective with the Danbury police department. Trompetta testified that, in connection with a probable cause hearing in this case, in 2007, he served a subpoena on Quinde at the Danbury residence of Quinde's mother. Trompetta testified that, to his knowledge, sometime after Quinde testified at the probable cause hearing, he returned to Ecuador and remained in that country. Trompetta testified that, approximately six months earlier, in connection with the earlier trial, he obtained Quinde's telephone number in Ecuador from Quinde's mother and that he spoke with Quinde. Trompetta testified that he told Quinde that his testimony at trial was crucial and asked Quinde to return to Connecticut but that Quinde indicated that "[h]e was not going to come back" and that "he had no interest in coming back . . . ." Nonetheless, Quinde asked Trompetta to advise him as to the outcome of the trial. Trompetta testified that he did not speak to Quinde after that conversation and did not speak to him in connection with the present trial. Trompetta testified that the state provided transportation and immigration assistance to two other witnesses who were living abroad, Georgina Diaz and Augusta Suarez, to ensure their presence at the trial.

Thereafter, the state offered Quinde's testimony from the probable cause hearing on the ground that he was

an unavailable witness. The defendant objected, arguing that the state had not demonstrated that it had exercised due diligence to present Quinde. Specifically, the defendant's attorney argued that, unlike its efforts with regard to other witnesses that were not in Connecticut, the state did not demonstrate that it had offered either to finance Quinde's travel to Connecticut from Ecuador or to handle immigration issues related to Quinde's travel. The defendant's attorney argued that because the state knew of Quinde's whereabouts for several months, which was not the case at the time of the first trial, efforts of such nature were likely feasible and the fact that they were not made should be considered by the court when evaluating the state's due diligence at the present trial. The court agreed with the defendant that the state had failed to demonstrate that Quinde was unavailable.

Later, the state presented the testimony of Maria Tigre, Quinde's mother. Tigre testified that Quinde was in Ecuador, she spoke with Quinde two weeks earlier and Quinde did not want to return to Connecticut. Tigre testified that Quinde did not want to return to Connecticut because of concerns about what the defendant would do to him if he was released from prison. Also, the state presented testimony from Craig Martin, a detective with the Danbury police department. Martin testified that, two weeks earlier, with the assistance of a Spanish speaking police officer, he contacted Quinde in Ecuador and tried to convince him to return to Connecticut. Quinde refused. Martin testified that in the weeks prior to trial, the police left several messages for Quinde, but he did not respond to these messages.

Once more, the prosecutor asked the court to admit into evidence the probable cause hearing testimony of Quinde. The prosecutor asserted that it had made a sufficient showing that Quinde was unavailable. In his objection, the defendant's attorney reiterated his earlier

argument that the state had not demonstrated that it offered to assist Quinde in returning to Connecticut for trial. Although the defendant's attorney argued that such offers of assistance were not necessary in all cases to demonstrate the unavailability of a witness, he argued that such efforts were necessary with regard to Quinde because the state had made such efforts to procure the live testimony of other witnesses in this case. The prosecutor represented that, although the state had provided travel assistance to two other witnesses after they had expressed a willingness to return to Connecticut for the trial, Quinde had not expressed such willingness. The prosecutor represented: "I don't think there's any reason to presume that, had . . . Quinde wanted to come back, that the state would not have [arranged for his transportation to and accommodations in Connecticut]."

The court ruled that the state met its burden of demonstrating that Quinde was unavailable. The court rejected the defendant's position that, on the facts of this case, the state bore the burden of demonstrating that it had offered to provide for travel and accommodations. Accordingly, the court admitted a transcript of Quinde's testimony at the probable cause hearing.[7]

On appeal, the defendant takes issue with the court's admission of the probable cause hearing testimony on the ground of Quinde's unavailability. The defendant characterizes the state's efforts to procure Quinde's presence at the trial as less than diligent. The defendant asserts that the state merely located Quinde and took at "face value" his representation that he would not

[7] In light of our determination that the court properly admitted Quinde's testimony on the ground that he was an unavailable witness, we need not discuss the substance of his testimony. Accordingly, we do not address the state's alternate argument that Quinde's testimony was cumulative of other evidence and that it was unlikely to have affected the jury's verdict.

return to testify. The defendant argues that the admission of Quinde's testimony deprived him of an opportunity to cast doubt on the testimony and an opportunity to demonstrate reasonable doubt of his guilt.[8]

It is well established that, in certain circumstances, a party may present the prior testimony of a declarant who is unavailable to testify. See Conn. Code Evid. § 8-6 (1). "In *State* v. *Frye*, 182 Conn. 476, 481, 438 A.2d 735 (1980), our Supreme Court recognized five of the most common situations in which a declarant will be deemed unavailable to testify. The situation most relevant to the present case is one in which the declarant is absent from the hearing and the proponent of his

---

[8] Although the defendant argues in part that the court's admission of the evidence violated his right to confrontation under the federal and state constitutions, we view the claim as being evidentiary, rather than constitutional, in nature. As a preliminary matter, we do not address the claim under the state constitution because the defendant did not provide this court with an independent analysis under the state constitution. See, e.g., *State* v. *Vakilzaden*, 272 Conn. 762, 768 n.11, 865 A.2d 1155 (2005) (declining to review state constitutional claim where claim not accompanied by independent analysis under state constitution). Furthermore, the defendant's analysis merely focuses on the propriety of the court's determination that Quinde was unavailable and, more specifically, whether the state exercised due diligence and made reasonable efforts to secure Quinde's live testimony at trial.

Beyond stating that the court violated his sixth amendment right to confrontation, the defendant does not undertake an analysis to demonstrate that, because he lacked an opportunity to cross-examine Quinde at the probable cause hearing, the admission of the testimony violated his rights under the confrontation clause of the sixth amendment to the United States Constitution. The defendant does not raise a *Crawford* claim and did not advance arguments of that nature before the trial court. See *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "Under *Crawford* v. *Washington*, supra, [68], the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence." *State* v. *Slater*, 285 Conn. 162, 169–70, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008).

statement has been unable to procure his attendance . . . *by process or other reasonable means.* . . . In interpreting reasonable means, [our Supreme Court has] held that the proponent must exercise due diligence and, at a minimum, make a good faith effort to procure the declarant's attendance. . . . The trial court has broad discretion in determining whether the proponent has shown a declarant to be unavailable. Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters. . . . [I]t is within the discretion of the trial court to accept or to reject the proponent's representations regarding the unavailability of a declarant and the trial court's ruling will generally not be disturbed unless the court has abused its discretion. . . .

"[D]ue diligence to procure the attendance of the absent witness [is] . . . an essential . . . predicate of unavailability. . . . To take advantage of the hearsay exceptions requiring unavailability, the proponent must show a good faith, genuine effort to procure the declarant's attendance by process or other reasonable means. . . . This showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declarant's attendance. . . . A proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wright,* 107 Conn. App. 85, 89–90, 943 A.2d 1159, cert. denied, 287 Conn. 914, 950 A.2d 1291 (2008).

We observe that the defendant does not argue that the court abused its discretion in accepting as true the evidence presented by the state with regard to its efforts to secure Quinde's attendance at the trial. Nor does the

defendant explicitly argue that the state had the ability to, but failed to, compel the attendance of Quinde, a foreign national, through its own process.

The record contains adequate evidence of the state's efforts, which may be summarized as follows. With the use of various databases, Comstock was able to determine that Quinde was in Ecuador and that, as late as September, 2009, there was no record of his presence in the United States. In March, 2009, Trompetta obtained Quinde's telephone number from his mother, Tigre, and spoke with Quinde via telephone, stressing the importance of his presence at trial. Quinde unambiguously stated that he was not returning to Connecticut to testify in the defendant's prosecution. This sentiment plainly was echoed by his mother who spoke with Quinde just two weeks prior to her testimony. Lastly, Martin contacted Quinde through a Spanish speaking officer just two weeks prior to his testimony, but Quinde again stated that he would not return to Connecticut to testify. In the weeks following this conversation, Quinde did not respond to additional messages left for him by the police.

Thus, the record reflects that persons, on behalf of the state, determined Quinde's whereabouts, conducted research to ensure that he was not in the United States, spoke with him about the importance of his presence at trial and directly inquired if he would return to testify. These efforts were made until the eve of trial. The gist of the defendant's arguments is that the state conceivably could have done more to secure Quinde's attendance by providing travel and immigration assistance to Quinde, taking steps to ensure that Quinde did not leave the country prior to trial and providing protection to Quinde during his stay in Connecticut. Again, the defendant argues that the state undertook greater efforts to secure the presence of other state witnesses who were living abroad.

There is no bright line test for gauging the diligence and reasonableness of the state's efforts to secure the attendance of a witness living abroad. As stated previously in this opinion, the issue becomes a "judgment call" for the trial court, one that we review for an abuse of discretion. (Internal quotation marks omitted.) *State v. Wright*, supra, 107 Conn. App. 89. In light of the ample evidence in the record of the state's timely and significant efforts to secure Quinde's live testimony, we conclude that the court's determination that the state made reasonable efforts was not an abuse of discretion. The defendant's arguments that the state could have taken *additional* steps in an attempt to secure Quinde's presence, or that perhaps it treated other witnesses differently, do not detract from the reasonableness of the state's efforts. It bears emphasizing that a showing of due diligence does not require that the state "do everything conceivable," but that it demonstrate that diligent and reasonable efforts were made. (Internal quotation marks omitted.) Id., 90. Accordingly, the defendant has not demonstrated that the admission of Quinde's probable cause hearing testimony was improper.

The judgment is affirmed.

In this opinion the other judges concurred.