******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* BRANDON
MONTRELL BELLAMY
(AC 35399)

DiPentima, C. J., and Bear and Keller, Js.

*Argued December 9, 2013—officially released April 22, 2014*

(Appeal from Superior Court, judicial district of New
Haven, Alexander, J.)

*James B. Streeto*, assistant public defender, for the
appellant (defendant).

*James M. Ralls*, assistant state's attorney, with
whom, on the brief, were *Michael Dearington*, state's
attorney, and *Michael Pepper* and *Kevin Doyle*, senior
assistant state's attorneys, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Brandon Montrell Bellamy, appeals from the judgment of conviction, rendered after a jury trial, of two counts of murder in violation of General Statutes § 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (5), criminal possession of a pistol in violation of General Statutes § 53a-217c (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. On appeal, the defendant claims that the trial court improperly (1) delivered prejudicial instructions to the jury, (2) granted the state's motion in limine barring evidence of an eyewitness' conviction for and involvement with prostitution, and (3) allowed the state to elicit prejudicial testimony from the mother of one of the victims. We affirm the judgment of the court.

The jury reasonably could have found the following facts. In 2008, two of the victims, Christopher Duncan and Justin Davis, lived together with Duncan's girlfriend, D,[1] in an apartment on the second and third floors of a house located at 124 County Street in New Haven. At times, the third victim, William Burruss, also stayed at the same apartment. On April 18, 2008, Duncan, Davis and Burruss drove to Gotham City, a New Haven nightclub. The defendant, with whom the victims were acquainted, also attended Gotham City that night.

Sometime during that evening, an altercation occurred between Burruss and the defendant; the two men pushed each other back and forth for approximately three or four minutes until club security broke up the fight. Following the incident, the three victims stayed at the club until it closed at approximately 3 a.m. without further interaction with the defendant. The victims left the club and, after dropping off another friend, drove back to County Street, listening to loud music on the way. Because the street was dark, the men drove past the house where they lived with the high beams activated to ensure that no one was waiting for them. Seeing no one, they turned around and parked in front of the house. Exiting the car, Duncan dropped something and stopped to pick it up, such that he was behind the others as they approached the house.

Upon coming to the driveway of the house, the victims heard a male voice from the side of the house saying, "What up, now?" A man in a hooded sweatshirt ran out from the shadows, firing several gunshots at the victims. Burruss was shot and fell to the ground. Duncan and Davis looked at each other and ran off in opposite directions. Duncan ran toward Goffe Street. He was shot in the arm and fell to the ground. When he jumped back up, he was shot again through the back. He continued to run, and when he reached the nearby street he flagged down a driver, who brought him to a hospital.

D, who was waiting for the victims at the house, had heard the loud music from the car and was coming down from the third floor to open the front door when she heard more than fifteen gunshots from the street. She ran into a bedroom on the second floor of the house and looked out the front window to see what was happening below. She saw a body lying motionless on the sidewalk in front of the house. Farther out into the street, she saw a man facing in the direction of Goffe Street. When the man turned his head, D recognized him as the defendant. She was unable to see whether he was carrying a gun. After a few seconds, the defendant ran off.

D went downstairs and exited the house, where she found Davis lying on the ground by the stairs to the house. After retrieving her cell phone from the apartment, she went back outside, where she saw Burruss' body. She then called emergency dispatch.

The police arrived on the scene at approximately 4 a.m. Burruss and Davis were taken to nearby hospitals, where they both were pronounced dead from multiple gunshot wounds.

The crime scene investigators swept the scene for evidence relating to the shooting. Twenty-two nine millimeter cartridge casings were recovered from the scene, and it was determined that all had been fired from the same weapon, most likely a Glock semiautomatic pistol. The weapon was never recovered. No fingerprint or DNA evidence recovered by the police tied the defendant to the scene.

After an investigation, the police arrested the defendant. Following a trial, the jury found the defendant guilty of two counts of murder, assault in the first degree, criminal possession of a pistol and carrying a pistol without a permit. The defendant received a total effective sentence of 100 years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

## I

The defendant first claims that the court delivered prejudicial jury instructions. He argues that (1) the instructions on the issue of identification were prejudicially erroneous and deprived him of a fair trial, and (2) the entire charge was delivered at such a rapid speed that the jury was unable to follow it. We affirm the judgment of the court.

## A

In support of his first claim, the defendant argues that the court's instructions prejudiced the defendant in that, contrary to the model instructions promulgated by the Judicial Branch, they emphasized the importance of the eyewitness' certainty without any qualification that certainty does not mean accuracy. He also argues

that the court did not instruct the jury as to certain factors for consideration that arguably would have favored the defendant, such as distance, lighting, the emotional state of the witness and the length of time between the crime and identification. We conclude that the defendant waived this claim.

The following additional facts and procedural history are relevant to our discussion. As both the state and the defense acknowledged in their closing arguments, the critical issue at trial was the identity of the shooter. The state's primary evidence establishing the defendant as the shooter was the testimony of D.

At trial, the defense pursued several strategies for discrediting D's testimony. This included noting the circumstances of her identification. When the police initially interviewed D on the night of the shooting in April, 2008, she denied having seen anyone responsible for the crime. It was not until August, 2010, after having moved out of state, that she communicated with the Office of the State's Attorney and told an inspector what she had seen that night. She explained her initial hesitance in revealing the identity of the shooter as being based on fear that the defendant would retaliate against her. The defense also highlighted the conditions under which D had witnessed the events in question, including the lighting, the distance, the viewing angle and her emotional state at the time.

The court gave the following instruction on identification: "Identity is an issue in every criminal case. An element of each offense is the identity of the perpetrator. The state must prove to you beyond a reasonable doubt that this defendant was the individual who committed the crimes that the jury considers. Therefore, the burden in this case is on the prosecution to prove beyond a reasonable doubt not only that the crimes charged were committed, but also that the defendant was the person who committed the crime. If the state does not prove the identity of the defendant as the perpetrator beyond a reasonable doubt in any of the offenses charged, you must find him not guilty of the offense. You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you convict him. It is your duty to recall and weigh and consider all of the evidence relating to the identification of the defendant. You should consider the opportunity the witness had to observe the defendant, the degree of certainty of the identification made by the witness, [and] whether the witness knew the defendant before the identification in any other circumstances that you think are relevant to the issue of identification of the defendant."

On appeal, the defendant claims for the first time that these instructions prejudiced him to the extent that his constitutional right to a fair trial was violated. The defendant seeks review of this unpreserved claim pur-

suant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[2] We will review an unpreserved claim when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Footnote omitted.) Id., 239–40.

In order to determine initially whether the defendant's claim is reviewable under *Golding*, we must first consider whether that claim was waived at trial. "A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . [I]n the usual *Golding* situation, the defendant raises a claim on appeal [that], while not preserved at trial, at least was not waived at trial. . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 467, 10 A.3d 942 (2011).

In *Kitchens*, our Supreme Court held that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. The court cautioned that "[s]uch a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." Id., 483.

In this case, the record reflects that the state and the defense were provided with a copy of a draft version of the jury instructions on November 4, 2010.[3] On November 8, 2010, the court solicited comments from both sides regarding changes or modifications to the instructions. Defense counsel did not make any objections to the instructions at that time. Subsequent to instructing the jury, the court again provided defense counsel with an opportunity to object to any portion of the instructions, and no objection was made as to the instruction on identification. At sentencing, defense counsel reiterated that the defense had been given an opportunity to view the instructions and voice any objections, and had declined to do so. In fact, defense

counsel explicitly stated that he did not have any issue with the content of the instructions and had "agreed on them" at the charging conference.

Since *Kitchens*, this court has found waiver in situations that resemble the facts of this case. In *State* v. *Beebe*, 131 Conn. App. 485, 493, 27 A.3d 26 (2011), cert. denied, 303 Conn. 921, 34 A.3d 397 (2012), we held that a defendant had waived the right to challenge jury instructions where "the court provided defense counsel with a copy of the draft jury charge," and "defense counsel had meaningful and multiple opportunities to review the trial court's instructions and to object to any language therein, and, in response to solicitation by the trial court, repeatedly indicated his satisfaction with the charge." (Internal quotation marks omitted.) In *State* v. *Charles*, 134 Conn. App. 242, 252, 39 A.3d 750, cert. denied, 304 Conn. 930, 42 A.3d 392 (2012), we held that a defendant had waived the right to challenge jury instructions where "defense counsel had a meaningful opportunity to review the court's written instructions and to object to any language therein [but] . . . proposed no instructions of his own and took no exceptions to the charge as given."

Here, defense counsel, having been provided with a draft copy of the jury instructions and a meaningful opportunity to review them and to alert the court to any potential issues, declined to object in any way to the portion concerning identification, and affirmatively expressed his satisfaction with the content of the instructions. Under these circumstances, the defendant has waived his claim of instructional error and, accordingly, it fails under the third prong of *Golding*.[4]

B

The defendant also claims that the court erred in delivering the jury instructions at such a rapid speed that the jury was unable to follow them. We disagree.

Following final arguments, the court read the instructions to the jury. The court then asked whether either side wanted to object to the instructions. The defense did not object to the speed at which the instruction was delivered or state any concerns about the clarity or comprehensibility of the instructions. While deliberating, the jury asked for a copy of the instructions, which was provided in written form.

After the guilty verdict, the defendant filed a motion for a new trial on the ground that, among other things, "[t]he court's instructions tilted the scales of justice in a fundamentally unfair manner, causing material injury to the defense's case . . . ." At sentencing, defense counsel was heard on the motion, and he explained that his issue with the instructions "was the speed with [which] the court went through the instructions to the jury." He explained that he had a hard time following the instructions and argued that the fact that the jury

had requested a copy of the instructions supported his argument. The court denied the motion, finding that "the instructions are given at the same rate of speed for every trial" and were delivered in "the court's normal manner of speaking out when it relates its instructions." The court also noted that "the jury did have the benefit of the actual transcript of the court's instructions going in with them in their deliberative process."

On appeal, the defendant challenges the court's denial of the motion for a new trial on the ground that the court erred in finding that the instructions were comprehensible. The defendant argues that the claim is properly preserved by the postjudgment motion for a new trial or, alternatively, that the claim is reviewable under *Golding*, as the rapid delivery deprived him of a constitutionally guaranteed fair trial.

As a preliminary matter, we note that a party who is concerned with the speed in which a judge is delivering instructions should object at the time the instructions are being read so that the judge is aware of the party's concerns and can adjust the speed of delivery or take other corrective steps if appropriate. Waiting until after the verdict has been entered and the jury has been discharged places the judge and the other parties in an unfair position. In this case, however, we agree that the defendant's motion for a new trial preserved the claim, and we therefore proceed to its merits without consideration of *Golding*.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds." (Internal quotation marks omitted.) *State* v. *Holmes*, 75 Conn. App. 721, 727, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003). We will not disturb a trial court's findings of fact in ruling on a motion for a new trial unless they are clearly erroneous. Id., 728. "A finding of fact is clearly erroneous when there is no evidence to support it . . . or when . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling . . . ." (Internal quotation marks omitted.) Id.

At the defendant's request and without objection from the state, we have listened to an audio recording of the court's delivery of the jury instructions and have determined that the speed at which the jury instructions were delivered falls within an acceptable standard. Therefore, we cannot conclude that the court's factual finding that the instructions were comprehensible was

clearly erroneous. We further note that the jury asked for and received a written copy of the instructions. Accordingly, the court acted within its discretion in denying the defendant's motion for a new trial.

## II

Next, the defendant claims that the court erred in granting the state's motion in limine barring evidence of D's conviction for and involvement with prostitution. Specifically, he argues that D's involvement with the victims in the enterprise of prostitution was relevant to establish that she was biased in favor of one of the victims. We are not persuaded.

Prior to trial, the state filed a motion in limine asking the court to require the defense to make an offer of proof outside the presence of the jury prior to pursuing any evidence about D's involvement with the victims in the enterprise of prostitution. During trial, prior to D's testimony and outside the presence of the jury, the defense argued that such evidence was necessary to show that the victims played a caretaker role in D's life and that money was being shared between them, in contrast to the straightforward romantic relationship between Duncan and D that had been portrayed by Duncan. The state argued that such evidence would be more prejudicial to the witness' credibility than probative of bias. The court ruled that any evidence of D's involvement with prostitution was barred because it was not relevant to D's credibility.

We review a court's evidentiary rulings under the abuse of discretion standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Martinez*, 295 Conn. 758, 769–70, 991 A.2d 1086 (2010).

The credibility of a witness may be impeached by evidence showing the witness' bias toward another person. Conn. Code Evid. § 6-5. Such impeachment may be accomplished through examination of the witness or through the introduction of extrinsic evidence, but the offering party bears the burden of establishing the relevancy of the impeachment evidence. *State* v. *Brown*, 273 Conn. 330, 341, 869 A.2d 1224 (2005). Otherwise relevant evidence may be excluded if the court, in its discretion, determines that the probative value of the evidence is outweighed by the danger of unfair prejudice. Id., 342; see also Conn. Code Evid. § 4-3. "Unfair prejudice occurs where the facts offered may unduly arouse the jury's emotions, hostility or sympathy

. . . ." (Internal quotation marks omitted.) *State* v. *Douglas*, 126 Conn. App. 192, 219, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

In this case, the court concluded that evidence of D's involvement with prostitution was "not relevant to any finding of credibility or bias." At that point in the trial, testimony had been adduced establishing that D lived with two of the victims and was in a romantic relationship with one of them. It also was established that the third victim was a frequent guest at the apartment D and the other victims shared. After a careful review of the record, we cannot conclude that the court abused its discretion in precluding the impeachment evidence.[5]

### III

Next, the defendant claims that the court erred in allowing the state to elicit unduly prejudicial testimony from the mother of one of the victims. Specifically, the defendant argues that the prejudice to the defendant caused by the mother's testimony that the surviving victim identified the shooter outweighed its probative value as a prior inconsistent statement. As we afford great deference in reviewing such evidentiary rulings, we are not persuaded.

The following additional facts and procedural history are relevant to our analysis of the issue. At trial, Duncan, the surviving victim, testified that he was unable to identify the shooter because it was too dark. This testimony was consistent with what Duncan had told the police during their investigation of the crime. In order to impeach this testimony, the state sought to produce, as evidence of a prior inconsistent statement, testimony from Lynne Jones, the mother of Burruss, that Duncan had spoken to her after the shooting and identified the defendant as the shooter. The state also sought to elicit testimony from Jones that Duncan had recounted to her details of the fight between the defendant and Burruss at the nightclub and had described Burruss as having choked the defendant, a detail that Duncan had not included while testifying at trial. The state laid the foundation for such testimony by providing Duncan with an opportunity to explain these inconsistencies on direct examination.

During trial, the defendant moved to preclude such testimony on the grounds that it was hearsay and that the potential to prejudice the defendant outweighed its probative value. The state argued that it was proper inconsistent statement evidence for the purpose of impeaching Duncan and should be admitted subject to a limiting instruction. The court concluded that Jones' testimony would be admitted, but as to the identification, in order to avoid prejudice, she would be instructed to testify only that Duncan had identified an individual by name and not specify that the defendant was that individual. As to the altercation at the club, the

court allowed the state to elicit testimony specifically referring to the defendant because Duncan already had identified the defendant as being involved in the incident.

Jones was then called before the jury, where she testified that Duncan had visited her prior to her son's funeral. She explained that she asked Duncan who had killed her son and that he told her the name of the person responsible for the shooting. The prosecution then immediately asked Jones what Duncan had told her about the altercation at the club, and Jones said that Duncan told her that Burruss had "choked [the defendant] out." The court instructed the jury to consider the testimony only for purposes of evaluating Duncan's credibility.

On appeal, the defendant claims that any testimony from Jones that Duncan had identified an individual responsible for the shooting should have been barred. The defendant argues that the prejudicial effect of the testimony was particularly high, given the circumstances of a mother being told the identity of her son's murderer, and the probative value was particularly low because evidence of Duncan's conversation with Jones was collateral to the central issue of identification. We are not persuaded.

As set forth in part II of this opinion, we review a court's evidentiary rulings under the abuse of discretion standard. The credibility of a witness may be impeached by evidence that the witness previously made a statement inconsistent with that made at trial. *State* v. *Douglas F.*, 145 Conn. App. 238, 249, 73 A.3d 915, cert. denied, 310 Conn. 955, 81 A.3d 1181 (2013); see also Conn. Code Evid. § 6-10. Like other evidence, a prior inconsistent statement may be excluded at the court's discretion if its probative value is outweighed by its prejudicial effect. See *State* v. *Carter*, 189 Conn. 631, 642, 458 A.2d 379 (1983); see also Conn. Code Evid. § 4-3. "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Morquecho*, 138 Conn. App. 841, 853–54, 54 A.3d 609, cert. denied, 307 Conn. 941, 56 A.3d 948 (2012).

In this case, the court recognized the possibility of undue prejudice caused by Jones' account and thus restricted her testimony to preclude any identification of the defendant as the shooter. This, along with the limiting instruction by the court, was sufficient to guard against the jury considering the evidence for an improper purpose. Furthermore, the prior inconsistent statement was highly probative in calling into question Duncan's testimony that he was unable to identify the

shooter due to darkness, an issue that lay at the heart of the case. Accordingly, we do not find cause to upset the court's discretionary ruling.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In order to protect the privacy interests of the witness, we do not identify the witness by name.

[2] The defendant also seeks plain error review of this claim. See Practice Book § 60-5. To the extent that the claim is amenable to review under the plain error doctrine, we are not persuaded that an error exists that is so obvious that it affects the fairness and integrity of and the public confidence in the judicial proceedings or that the court's instructions caused the defendant to suffer manifest injustice. See *State* v. *Santiago*, 100 Conn. App. 236, 254, 917 A.2d 1051, cert. denied, 284 Conn. 933, 935 A.2d 153 (2007).

[3] Although the defendant is correct that the record does not indicate that the defense was provided with a finalized version of the instructions, there is no indication from the record that the final instructions as to identification were altered in any way from the draft version except for the addition of language declaring that it is the state's burden to prove identity beyond a reasonable doubt. The court notified the defense of this additional language prior to instruction, and it does not relate to the reliability of an eyewitness, which is the subject of the defendant's claim on appeal.

[4] The defendant relies on *State* v. *Devalda*, 306 Conn. 494, 50 A.3d 882 (2012), and *State* v. *Brown*, 299 Conn. 640, 11 A.3d 663 (2011), wherein instructional claims were held to have not been waived under a *Kitchens* analysis because the records in those cases were not sufficiently complete to show that the defense counsel was apprised of the instructions prior to the jury being charged. These cases are distinguishable from the present case because here, after the "close examination of the record and the particular facts and circumstances of [the] case" required by *Kitchens*, we have ascertained that defense counsel was made aware of the content of the instructions before they were delivered to the jury. *State* v. *Kitchens*, supra, 299 Conn. 483.

[5] The defendant also argues, for the first time on appeal, that evidence of D's involvement in prostitution should have been allowed because the state "opened the door" for such evidence by inquiring into the witness' relationship with the victims. As "[o]ur review . . . of evidentiary rulings made by the trial court is limited to the specific legal ground raised [at trial]," we decline to review this claim. *State* v. *Holloway*, 117 Conn. App. 798, 813, 982 A.2d 231 (2009) ("[t]o permit a party to raise a different ground on appeal than was raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party" [internal quotation marks omitted]), cert. denied, 297 Conn. 925, 998 A.2d 1194 (2010).